UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| DAVID R. JONES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Cause No. 1:14-cv-271 |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

This matter is before the court on petition for judicial review of the decision of the

Commissioner filed by the plaintiff, David R. Jones, on September 4, 2014. For the following

reasons, the decision of the Commissioner is **REMANDED**.

*Background*

The plaintiff, David R. Jones, filed an application for Disability Insurance Benefits and

Supplemental Security Income on March 30, 2011, alleging a disability onset date of March 11,

2010. (Tr. 14). The Disability Determination Bureau denied Jones' application on June 28,

2011, and again upon reconsideration on August 11, 2011. (Tr. 14). Jones subsequently filed a

timely request for a hearing on August 24, 2011. (Tr. 14). A hearing was held on November 16,

2012, before Administrative Law Judge (ALJ) Yvonne K. Stam, and the ALJ issued an

unfavorable decision on February 11, 2013. (Tr. 14, 25). Vocational Expert (VE) Sharon D.

Ringenberg, Barbara Dunfee, Jones' mother, and Jones testified at the hearing. (Tr. 14). The

Appeals Council denied review on July 8, 2014, making the ALJ's decision the final decision of

the Commissioner. (Tr. 1–6).

The ALJ found that Jones met the insured status requirements of the Social Security Act through June 30, 2015. (Tr. 16). At step one of the five step sequential analysis for determining whether an individual is disabled, the ALJ found that Jones had not engaged in substantial gainful activity since March 11, 2010, the alleged onset date. (Tr. 16). At step two, the ALJ determined that Jones had the following severe impairments: obstructive sleep apnea, narcolepsy with cataplexy, degenerative disc disease, depression, and anxiety. (Tr. 16). At step three, the ALJ concluded that Jones did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 17).

In determining whether Jones had an impairment or combination of impairments that met the severity of one of the listed impairments, the ALJ considered Listing 1.04, Disorders of the Spine, and Listing 11.03, Epilepsy. (Tr. 17–18). Additionally, she considered the Paragraph B criteria for mental impairments, which required at least two of the following:

> marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.

(Tr. 18). The ALJ defined a marked limitation as more than moderate but less than extreme and repeated episodes of decompensation, each of extended duration, as three episodes within one year or once every four months with each episode lasting at least two weeks. (Tr. 18).

Despite finding Jones' claims inconsistent, the ALJ concluded that Jones had a mild restriction in daily living activities. (Tr. 18). Jones told consultative psychologist, Dr. Mayle, that he relied entirely on his mother for daily activities, such as driving, shopping, and cleaning. (Tr. 18). However, Jones reported previously that he drove himself to the consultative examination and that he could drive, shop, do laundry, prepare simple meals, and load the dishwasher. (Tr. 18). His mother also reported that Jones could shop and go to appointments

independently. (Tr. 18). Additionally, Jones and his mother indicated that he could not live independently, but the record demonstrated that he lived "alone" in an apartment he rented within his parents' home. (Tr. 18). Furthermore, Jones was enrolled in college, maintained a "C" average, despite some difficulty with grades and absenteeism, and his ability to function improved with medication compliance. (Tr. 18).

The ALJ found that Jones had moderate difficulties in social functioning. (Tr. 18). Jones commented that he could visit with friends and family on a weekly basis, other sources indicated that he was cooperative, and the record did not show that he failed to relate appropriately to others. (Tr. 18). One source noted that Jones had good social skills, but the record demonstrated that increased stress exacerbated cataplexy episodes. (Tr. 18). Jones reported that he was easily agitated, tended to isolate himself, and went out "as little as possible." (Tr. 18).

The ALJ found that Jones had moderate difficulties in concentration, persistence, or pace. (Tr. 18). Jones reported that he had difficulty concentrating, understanding, and remembering instructions. (Tr. 18). However, during sensorium and cognitive functioning, Dr. Mayle concluded that Jones had adequate memory, insight, and judgment. (Tr. 18). Dr. Mayle also found that Jones had little difficulty with calculations but could not complete serial 7's. (Tr. 18). Additionally, she claimed that Jones appeared oriented but had a flat affect and depressed mood. (Tr. 18). Another evaluator reported that Jones had average intellect. (Tr. 18–19).

The ALJ determined that Jones had experienced no episodes of decompensation of extended duration. (Tr. 19). She stated that the record failed to document the loss of adaptive functioning because it indicated that Jones lived independently and denied a history of psychiatric hospitalizations or similar episodes. (Tr. 19). Therefore, the ALJ found that Jones did not satisfy Paragraph B because his mental impairments did not cause at least two marked

limitations or one marked limitation and repeated episodes of decompensation of extended

duration. (Tr. 19). The ALJ also determined that Jones did not meet the requirements for

Paragraph C under Listing 12.04 or 12.06. (Tr. 19). She indicated that there was no evidence

from the record that a marginal adjustment in Jones' mental impairment, such as a minimal

increase in mental demands or a change in environment, would be predicted to cause

decompensation. (Tr. 19). The ALJ also noted that Jones did not have a history of inability to

function outside of a highly supportive living arrangement for one or more years. (Tr. 19).

The ALJ then assessed Jones' residual functional capacity as follows:

> the claimant has the residual functional capacity to perform light
> work as defined in 20 CFR 404.1567(b) and 416.967(b) except that
> the claimant could not climb ladders, ropes, or scaffolds. He could
> occasionally climb ramps or stairs. He could occasionally balance.
> He should avoid even moderate exposure to hazards, such as
> unguarded heights and unprotected machinery. In addition, the
> claimant should not work with the general public and he should be
> limited to brief, superficial contact with coworkers and supervisors,
> in a relatively unchanging work setting and process.

(Tr. 19). The ALJ explained that in considering Jones' symptoms she followed a two-step

process. (Tr. 20). First, she determined whether there was an underlying medically determinable

physical or mental impairment that was shown by a medically acceptable clinical and laboratory

diagnostic technique that reasonably could be expected to produce Jones' pain or other

symptoms. (Tr. 20). Then, she evaluated the intensity, persistence, and limiting effects of the

symptoms to determine the extent to which they limited Jones' functioning. (Tr. 20).

Jones has alleged disability primarily stemming from the effects of narcolepsy with

cataplexy as well as depression, anxiety, and chronic back pain. (Tr. 20). He reported

involuntary movements several times per day, insomnia, sleep paralysis, daytime sleepiness, and

general fatigue. (Tr. 20). He also claimed muscle contractions and pain throughout his body,

particularly the abdomen, mid-back, wrists, shoulders, and legs.  (Tr. 20).  Jones testified that he had difficulty at school due to fatigue and sleepiness and that emotional stress, surprising events, and loud noises triggered cataplexy episodes.  (Tr. 20).  Moreover, he alleged difficulty walking due to imbalance, incontinence, difficulty focusing, and dropping objects.  (Tr. 20).

The ALJ found that Jones' medically determinable impairments reasonably could cause the alleged symptoms, but she found that Jones was incredible regarding the intensity, persistence, and limiting effects of the symptoms.  (Tr. 20).  She indicated that the record did not support Jones' reporting of the frequency or severity of his cataplexy episodes or his significant functioning abnormalities.  (Tr. 20).  The ALJ also indicated that the record repeatedly documented significant improvements in Jones' symptoms and functioning with medication compliance and weight loss.  (Tr. 20).

The ALJ found that the record detailed treatment for chronic pain and repeated epidural injections throughout Jones' lumbar and thoracic spine but that diagnostic imaging failed to show any significant spinal abnormalities.  (Tr. 20).  Magnetic resonance imaging of Jones' cervical spine showed "minimal degenerative changes" without significant pathology.  (Tr. 20).  The imaging also showed "mild degenerative disc disease" and a "minimal" disc protrusion in the lumbosacral region.  (Tr. 20).  A source claimed that Jones had an exaggerated response to palpation on the lower back, which suggested that Jones magnified the severity of his back pain symptoms.  (Tr. 20).  Physical exams also showed some tenderness throughout the cervical, lumbar, and thoracic spine with positive facet loading, positive straight leg raising, and limited range of motion secondary to pain.  (Tr. 20).  However, Jones' gait was normal, and he could heel, toe, and tandem gait without difficulty or abnormality.  (Tr. 20).

Jones also had normal muscle and motor strength without evidence of edema or atrophy. (Tr. 20–21). He had mild hip pain during hip rotation, and his reflexes were normal except for a hyper exaggerated response in the left upper and lower extremities. (Tr. 21). However, his sensory was intact, and he had remarkable improvement in his overall pain and functioning after a significant weight loss of nearly 100 pounds. (Tr. 21). He could go to the gym four to five times per week because his pain medication helped him tolerate his workouts. (Tr. 21). Jones reported improvement with medication and requested reduced pain medication. (Tr. 21).

The record also showed substantial improvement in Jones' narcolepsy and cataplexy symptoms, but Jones argued that he had severe symptoms related to these issues, such as loss of muscle tone and involuntary body movements. (Tr. 21). Jones claimed that several physicians observed those symptoms and that he continued to have frequent episodes. (Tr. 21). However, the ALJ found that the medical evidence did not corroborate the frequency or severity of the episodes. (Tr. 21). In 2010, Jones was diagnosed with a "movement disorder," most likely factitious myoclonus, but repeated physical exams showed normal muscle tone and sensation, which did not support muscle loss. (Tr. 21). Moreover, sources indicated that Jones' involuntary movements were atypical and possibly were stress-related. (Tr. 21).

Testing revealed obstructive sleep apnea with hypersomnia and narcolepsy with cataplexy. (Tr. 21). Doctors prescribed medication and a C-PAP machine to assist with sleeping. (Tr. 21). Jones reported substantial symptom improvement while taking his prescribed medication, including decreased tremors, muscle spasms, and cataplexy. (Tr. 21). Additionally, Jones' improvement led him to decrease or discontinue his medications. (Tr. 21). A medical source claimed that Jones' medications helped his symptoms "tremendously." (Tr. 21). However, Jones was not fully compliant with the C-PAP machine, which adversely affected his

ability to sleep and increased daytime sleepiness, and a medical source noted poor posture and body condition after Jones discontinued his medication. (Tr. 21).

Jones' gait was often described as normal or intact, and sources noted that he was ambulatory and required no assistance. (Tr. 21). Despite one source noting a nonfunctional gait, the ALJ determined that the records failed to document any abnormality in Jones' gait. (Tr. 21). Jones had an incident where he fell following a cataplexy episode and scratched his eye, but his physical examination was normal and he was alert, oriented, and ambulated without difficulty. (Tr. 21). The vocational rehabilitation source claimed that Jones appeared to slump to the left but did not note any other abnormal behavior. (Tr. 21–22). The ALJ concluded that the medical evidence did not corroborate the frequency or severity of Jones' cataplexy and that medication compliance and weight management appeared to control the condition. (Tr. 22).

Jones also listed depression and anxiety symptoms. (Tr. 22). He reported crying spells and appeared to be very emotional. (Tr. 22). However, the record showed that medication markedly improved Jones' symptoms, which caused him to want to wean off medication. (Tr. 22). Jones claimed that he did not receive supportive mental health treatment, despite an examining source's recommendation to see a therapist. (Tr. 22). The ALJ concluded that Jones' failure to participate in supportive mental health treatment discredited his allegations of disabling mental symptoms. (Tr. 22). The ALJ also concluded that Jones' presentation at the consultative examination was not consistent with the medical evidence of record. (Tr. 22). Jones reported extremely limited daily activities, but treatment records supported significant improvement in his overall functioning and symptoms. (Tr. 22). The ALJ found Dr. Mayle's assessment, described as a snapshot of Jones' day-to-day functioning, inconsistent with the evidence that documented a

significant improvement in Jones' quality of life, such as his participation in vocational rehabilitation and college courses. (Tr. 22).

The ALJ also identified inconsistent statements regarding Jones' disability. (Tr. 22). In March 2010, Jones reported that he had a significant lapse of functioning and that he could not walk for two weeks. (Tr. 22). However, the ALJ did not find any reference to this episode in the record, so she concluded that Jones had exaggerated his symptoms. (Tr. 22). Jones and his mother claimed that he had bladder and bowel dysfunction, but the record also failed to document these events. (Tr. 22). Jones' mother claimed that he was weak and unable to lift more than seven pounds, but the record indicated that Jones exercised four to five days per week. (Tr. 22). Jones indicated that he used marijuana infrequently, but he told another source that he abused marijuana daily. (Tr. 22). Although the ALJ concluded that Jones might not have consciously attempted to mislead, the inconsistencies did suggest that Jones was not entirely reliable or may have exaggerated his condition. (Tr. 22).

The ALJ then considered the opinion evidence and noted that no treating source provided an opinion on Jones' functional capacity. (Tr. 22). Given Jones' allegations of totally disabling symptoms, the ALJ concluded that one might expect a treating source to place a restriction on Jones. (Tr. 22). However, no treating sources recommended any restrictions or limitations. (Tr. 22). The ALJ gave little weight to the State agency medical consultants' physical assessments, which found that Jones had no severe physical impairments. (Tr. 22). Although the State agency's findings were consistent with a non-disabled finding, the ALJ concluded that the medical evidence supported exertional and nonexertional limitations. (Tr. 22–23). The ALJ gave significant weight to the State agency psychological consultants' mental assessments because they were largely consistent with the RFC. (Tr. 23).

The ALJ gave Dr. Mayle's consultative examination some weight. (Tr. 23). Dr. Mayle did not determine whether Jones could function in a work setting despite his impairments. (Tr. 23). Additionally, he seemed to accept Jones' subjective allegations and limitations uncritically, particularly Jones' allegations of limited daily living activities, which were inconsistent with the credible evidence. (Tr. 23). However, the ALJ concluded that Dr. Mayle's opinion was not inconsistent with the mental limitations in the RFC, which accommodated for limitations in social functioning and concentration, persistence, or pace. (Tr. 23).

Finally, the ALJ considered Jones' mother's function report and testimony. (Tr. 23). Although not a medical opinion, information from other sources could provide insight into the severity of Jones' impairments and their effect on his functioning. (Tr. 23). However, the ALJ concluded that Jones' mother's report was not corroborated by credible, objective medical evidence. (Tr. 23). The ALJ also indicated that she may have exaggerated her testimony to assist Jones out of sympathy. (Tr. 23).

Ultimately, the ALJ concluded that the objective medical evidence supported her RFC assessment. (Tr. 23). She found that the record documented a significant improvement in Jones' ability to function as well as his overall quality of life. (Tr. 23). Moreover, she determined that the RFC adequately accommodated Jones' limitations and that he remained capable of performing light work with additional nonexertional and mental limitations. (Tr. 23).

At step four, the ALJ found that Jones could not perform his past relevant work. (Tr. 23). Considering Jones' age, education, work experience, and RFC, the ALJ concluded that there were jobs in the national economy that Jones could perform, including housekeeper/cleaner (150 jobs regionally, 2,000 jobs in Indiana, and 120,000 jobs nationally), towel folder (200 jobs

regionally, 2,000 jobs in Indiana, and 80,000 jobs nationally), and hand packager (100 jobs regionally, 2,000 jobs in Indiana, and 40,000 jobs nationally).  (Tr. 23–24).

*Discussion*

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence.  **42 U.S.C. § 405(g)** ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014); *Bates v. Colvin*, 736 F.3d 1093, 1097 (7th Cir. 2013) ("We will uphold the Commissioner's final decision if the ALJ applied the correct legal standards and supported her decision with substantial evidence."); *Pepper v. Colvin*, 712 F.3d 351, 361–62 (7th Cir. 2013); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 852 (1972) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 2d 140 (1938)); *see Bates*, 736 F.3d at 1098; *Pepper*, 712 F.3d at 361–62; *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002).  An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law.  *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013); *Rice v. Barnhart*, 384 F.3d 363, 368–69 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues."  *Lopez*, 336 F.3d at 539.

Disability and supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act.  The claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. § 423(d)(1)(A)**.  The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability.  **20 C.F.R. §§ 404.1520, 416.920**.  The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity."  **20 C.F.R. §§ 404.1520(b), 416.920(b)**.  If he is, the claimant is not disabled and the evaluation process is over.  If he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities."  **20 C.F.R. §§ 404.1520(c), 416.920(c)**; *see Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (discussing that the ALJ must consider the combined effects of the claimant's impairments).  Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations.  **20 C.F.R. § 401, pt. 404, subpt. P, app. 1**.  If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling.  However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of his past work.  If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled.  **20 C.F.R. §§ 404.1520(e), 416.920(e)**.  However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of his age, education, job

experience, and functional capacity to work, is capable of performing other work and that such work exists in the national economy.  **42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1520(f), 416.920(f)**.

First, Jones has argued that the ALJ failed to incorporate her conclusion that Jones had moderate difficulties in concentration, persistence, or pace into the hypothetical question posed to the VE.  The ALJ's hypothetical asked the VE to assume an individual with the same age, education, and work history as Jones.  (Tr. 55).  Additionally, the individual was limited to light work without ladders, ropes, or scaffolds, with occasional ramps, stairs, and balance, and without moderate exposure to hazards, such as unguarded heights or unprotected machinery.  (Tr. 55). The ALJ then included the following mental limitations "the individual should not work with the general public; brief, superficial contact with co-workers and supervisors in a relatively unchanging work setting and process."  (Tr. 55).  Based on that hypothetical, the VE determined that Jones could not perform his past relevant work but could perform other work that existed in significant numbers in the national economy.  (Tr. 55–56).

The ALJ's RFC assessment and the hypothetical posed to the VE must incorporate all of the claimant's limitations supported by the medical record.  ***Yurt v. Colvin***, 758 F.3d 850, 857 (7th Cir. 2014) (citing ***O'Connor-Spinner v. Astrue***, 627 F.3d 614, 619 (7th Cir. 2010)); ***Indoranto v. Barnhart***, 374 F.3d 470, 473–74 (7th Cir. 2004) ("If the ALJ relies on testimony from a vocational expert, the hypothetical question he poses to the VE must incorporate all of the claimant's limitations supported by medical evidence in the record.").  That includes any deficiencies the claimant has in concentration, persistence, or pace.  ***Yurt***, 758 F.3d at 857; ***O'Connor-Spinner***, 627 F.3d at 619 ("Among the limitations the VE must consider are deficiencies of concentration, persistence and pace."); ***Stewart v. Astrue***, 561 F.3d 679, 684 (7th

Cir. 2009) (indicating that the hypothetical question "must account for documented limitations of 'concentration, persistence, or pace'") (collecting cases). The most effective way to ensure that the VE is fully apprised of the claimant's limitations is to include them directly in the hypothetical. *O'Connor-Spinner*, 627 F.3d at 619.

However, ALJs do not need to explicitly state "concentration, persistence, or pace" in the hypothetical for all cases. *Yurt*, 758 F.3d at 857; *O'Connor-Spinner*, 627 F.3d at 619. Rather, a court may assume a VE's familiarity with a claimant's limitations, despite deficiencies in the hypothetical, when the VE independently reviewed the medical record or heard testimony directly addressing those limitations. *O'Connor-Spinner*, 627 F.3d at 619; *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009). This exception does not apply if the ALJ poses a series of increasingly restrictive hypotheticals because courts infer that the VE's attention is focused on the hypotheticals and not the record. *O'Connor-Spinner*, 627 F.3d at 619; *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004). Jones has argued that this exception does not apply because the record does not demonstrate that the VE independently reviewed the medical record or heard testimony directly addressing his limitations. The Commissioner has not argued that this exception applies, and the court has not found evidence in the record to support this exception. Therefore, this exception does not apply.

An ALJ's hypothetical may omit "concentration, persistence, or pace" when its manifest that the ALJ's phrasing specifically excluded tasks that someone with the claimant's limitations could not perform. *O'Connor-Spinner*, 627 F.3d at 619. For example, courts have upheld hypotheticals that restricted a claimant to low-stress work when the limitations were stress or panic related. *See Johansen v. Barnhart*, 314 F.3d 283, 285, 288–89 (7th Cir. 2002) (upholding a hypothetical formulated in terms of "repetitive, low-stress" work because the description

eliminated positions likely to trigger symptoms of the panic disorder that originated the claimant's moderate limitations in concentration, persistence, or pace); ***Arnold v. Barnhart***, 473 F.3d 816, 820, 823 (7th Cir. 2007) (upholding a hypothetical that restricted claimant to low-stress, low-production work when stress-induced headaches, frustration, and anger caused the claimant's difficulties in concentration, persistence, or pace).

Courts may uphold a hypothetical that does not mention "concentration, persistence, or pace" when the underlying conditions were mentioned and the link between the underlying condition and the concentration difficulties was apparent enough to incorporate those difficulties by reference. *See **Simila***, 573 F.3d at 521–22 (upholding the hypothetical but indicating the failure to include the specific limitations was "troubling"). Generally, terms like "simple, repetitive tasks" alone do not exclude from the VE's consideration those positions that present significant problems with concentration, persistence, or pace. ***Stewart***, 561 F.3d at 684–85 (finding hypothetical limited to simple, routine tasks did not account for limitations of concentration, persistence, or pace); *see **Kasarsky v. Barnhart***, 335 F.3d 539, 544 (7th Cir. 2003) (posing hypothetical as individual of borderline intelligence did not account for limitations of concentration).

Jones has argued that this exception does not apply because the phrase "relatively unchanging work setting and process" does not manifestly exclude tasks that someone could not perform with his limitations. However, the Commissioner has argued that "relatively unchanging work setting and process" explicitly accounts for moderate limitations in concentration, persistence, and pace. The Seventh Circuit has held that hypotheticals limiting claimants to "simple, repetitive tasks" or "unskilled work" did not address deficiencies of concentration, persistence, or pace adequately. ***O'Connor-Spinner***, 627 F.3d at 620 (collecting

cases).  Additionally, "the hypothetical must account for both the complexity of the tasks and the claimant's ability to stick with a task over a sustained period." **Warren v. Colvin**, 565 F. App'x 540, 544 (7th Cir. 2014) (citing **O'Connor-Spinner**, 627 F.3d at 620).

The ALJ's hypothetical does not adequately address Jones' concentration, persistence, and pace limitations.  The phrase "relatively unchanging work setting and process" addresses an inability to respond to change.  However, it does not address the complexity of the tasks or whether Jones could maintain a competitive pace over an adequate period of time.  The Commissioner has argued that the ALJ found Jones capable of maintaining a competitive pace over an adequate period of time because she gave great weight to the State agency psychological consultants' mental assessments.  (Tr. 23).  The State agency psychological consultants found that Jones could attend to tasks for a sufficient period of time to complete tasks.  (Tr. 403).  However, they also found that Jones could understand, remember, and carry-out simple tasks and could manage the stresses of simple work.  (Tr. 403).  Therefore, the hypothetical needed to account for Jones' limitation to simple work, but, as discussed above, the hypothetical did not account for the complexity of the tasks.  Thus, the hypothetical failed to account for Jones' limitations in concentration, persistence, and pace.

Additionally, the ALJ did not mention Jones' underlying conditions to adequately link his underlying limitations by reference.  Therefore, the Commissioner has not demonstrated that the ALJ's hypothetical met an exception to the **O'Connor-Spinner** requirement, which requires remand.  The Commissioner is directed to account for Jones' limitations in concentration, persistence, and pace in any VE hypothetical on remand.

Second, Jones has argued that the ALJ's determination that he was incredible was patently wrong.  This court will sustain the ALJ's credibility determination unless it is "patently

wrong" and not supported by the record.  ***Bates v. Colvin***, 736 F.3d 1093, 1098 (7th Cir. 2013);

***Schmidt v. Astrue***, 496 F.3d 833, 843 (7th Cir. 2007); ***Prochaska v. Barnhart***, 454 F.3d 731,

738 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or

argument that is unreasonable or unsupported . . . can the finding be reversed.").  The ALJ's

"unique position to observe a witness" entitles her opinion to great deference.  ***Nelson v. Apfel***,

131 F.3d 1228, 1237 (7th Cir. 1997); ***Allord v. Barnhart***, 455 F.3d 818, 821 (7th Cir. 2006).

However, if the ALJ does not make explicit findings and does not explain them "in a way that

affords meaningful review," the ALJ's credibility determination is not entitled to deference.

***Steele v. Barnhart***, 290 F.3d 936, 942 (7th Cir. 2002).  Further, "when such determinations rest

on objective factors or fundamental implausibilities rather than subjective considerations [such

as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision."

***Clifford v. Apfel***, 227 F.3d 863, 872 (7th Cir. 2000); *see **Bates***, 736 F.3d at 1098.

    The ALJ must determine a claimant's credibility only after considering all of the

claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can

reasonably be accepted as consistent with the objective medical evidence and other evidence."

**20 C.F.R. § 404.1529(a); *Arnold v. Barnhart***, 473 F.3d 816, 823 (7th Cir. 2007) ("[S]ubjective

complaints need not be accepted insofar as they clash with other, objective medical evidence in

the record."); ***Scheck v. Barnhart***, 357 F.3d 697, 703 (7th Cir. 2004).  If the claimant's

impairments reasonably could produce the symptoms of which the claimant is complaining, the

ALJ must evaluate the intensity and persistence of the claimant's symptoms through

consideration of the claimant's "medical history, the medical signs and laboratory findings, and

statements from [the claimant, the claimant's] treating or examining physician or psychologist,

or other persons about how [the claimant's] symptoms affect [the claimant]."  **20 C.F.R.**

**§ 404.1529(c);** *see Schmidt v. Barnhart*, 395 F.3d 737, 746–47 (7th Cir. 2005) ("These regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from merely ignoring the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding.").

Although a claimant's complaints of pain cannot be totally unsupported by the medical evidence, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence." SSR 96-7p, at *1; *see Moore v. Colvin*, 743 F.3d 1118, 1125 (7th Cir. 2014) ("'[T]he ALJ cannot reject a claimant's testimony about limitations on her daily activities solely by stating that such testimony is unsupported by the medical evidence.'") (quoting *Indoranto*, 374 F.3d at 474); *Indoranto*, 374 F.3d at 474; *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits."). Rather, if the

> [c]laimant indicates that pain is a significant factor of his or her alleged inability to work, the ALJ must obtain detailed descriptions of the claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. She must investigate all avenues presented that relate to pain, including claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties. Factors that must be considered include the nature and intensity of the claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities. (internal citations omitted).

*Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994); *see Zurawski v. Halter*, 245 F.3d 881, 887-88 (7th Cir. 2001).

In addition, when the ALJ discounts the claimant's description of pain because it is inconsistent with the objective medical evidence, she must make more than "a single, conclusory

statement . . . .  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p, at *2; *see **Minnick v. Colvin**, 775 F.3d 929, 937 (7th Cir. 2015) ("[A] failure to adequately explain his or her credibility finding by discussing specific reasons supported by the record is grounds for reversal.") (citations omitted); **Zurawski**, 245 F.3d at 887; **Diaz v. Chater**, 55 F.3d 300, 307-08 (7th Cir. 1995) (finding that the ALJ must articulate, at some minimum level, his analysis of the evidence).  She must "build an accurate and logical bridge from the evidence to [his] conclusion."  **Zurawski**, 245 F.3d at 887 (quoting **Clifford v. Apfel**, 227 F.3d 863, 872 (7th Cir. 2000)).  A minor discrepancy, coupled with the ALJ's observations is sufficient to support a finding that the claimant was incredible.  **Bates**, 736 F.3d at 1099.  However, this must be weighed against the ALJ's duty to build the record and not to ignore a line of evidence that suggests a disability.  **Bates**, 736 F.3d at 1099.

Jones has presented four issues with the ALJ's credibility finding.  Specifically, he has argued that the ALJ erred by discounting the frequency and severity of his cataplexy episodes and his claims of chronic pain, and by discrediting him for his fitness routine, weight loss, improvement with medication, and medication noncompliance.  Jones has claimed that the ALJ erred by failing to explain how the record failed to support the frequency and severity of his cataplexy episodes.  He noted that the ALJ discredited his chronic pain because imaging studies showed mild abnormalities and a doctor thought Jones had an exaggerated response to palpation. Jones has argued that the ALJ should have further investigated the doctor's statement before

drawing a negative connotation because "exaggerated" could mean greater than expected without implying malingering.

The ALJ discredited Jones' claims because he lost nearly 100 pounds by going to the gym four to five days per week. However, Jones has argued that the ALJ should have investigated his fitness routine and whether it was inconsistent with his allegations before finding that it negatively affected his credibility. Similarly, he has claimed that the ALJ made unsupported assumptions about his medication noncompliance and improvement with medication. Jones indicated that he was compliant with his medication and attempted to minimize his need for narcotic or prescription medication.

The Commissioner has argued that the ALJ evaluated Jones' credibility properly. She noted that the ALJ reviewed the documented improvements in Jones' narcolepsy and cataplexy symptoms and that she identified inconsistencies with Jones' allegations. The Commissioner also indicated that the ALJ did not find Jones incredible because his workout routine demonstrated an ability to work. Rather, the ALJ found him incredible because he worked out four to five days a week when he claimed incapacitating symptoms. Similarly, the ALJ found him incredible because he could attend college classes and participate in vocational rehabilitation during that time. Furthermore, the Commissioner noted that the ALJ reviewed inconsistencies between Jones' claims and the objective medical evidence to demonstrate that his condition had improved and that he stopped using medications as his condition improved.

The ALJ reviewed the objective medical evidence and noted inconsistencies between it and Jones' claims. For example, the ALJ noted that the record did not support Jones' claim of muscle loss and indicated that sources found Jones' involuntary movements atypical and possibly stress-related. Additionally, she discussed Jones' allegation of balance issues but noted

that sources described his gait as normal and intact.  The ALJ also identified inconsistencies between the record and Jones' reported marijuana use, strength, and bladder and bowel dysfunction.  Therefore, the ALJ has built a logical bridge from the evidence to her credibility determination.  However, because this matter is being remanded on a separate issue, the ALJ may further explain her credibility determination on remand.  Specifically, she may address the issues Jones has presented with her credibility finding.

Third, Jones has argued that the ALJ failed to consider Listing 12.07 for somatoform disorders.  Somatoform disorder is defined as "'[a] group of closely related mental illnesses characterized by distressing physical symptoms that lack a physical cause and arise instead from emotional conflict or anxiety.'"  **Utterback v. Colvin**, 2014 WL 976899, at *15 (W.D. Wis. Mar. 12, 2014) (quoting American Medical Association, *Complete Medical Encyclopedia* 1142 (2003)).  Listing 12.07 for somatoform disorders applies when there is evidence of physical symptoms without any known physiological mechanisms or demonstrable organic findings.  **20 C.F.R. Pt. 404, Subpt. P, App. 1**.

At the hearing, Jones described bending at the waist and buckling of the knees that were triggered by emotions, such as anxiousness.  He reported similar movements caused by emotions to doctors and other medical sources.  (Tr. 215, 508).  Therefore, Jones has argued that the ALJ should have consider Listing 12.07 because he exhibited the necessary symptoms.  The ALJ did not indicate whether she considered Listing 12.07, but the Commissioner has argued that she relied on the opinions of two psychologists who determined that Jones' symptoms did not meet Listing 12.07.  Additionally, the Commissioner noted that Jones' counsel did not raise a somatoform disorder argument at the hearing.  Considering that this matter will be remanded on a separate issue, the ALJ may consider Listing 12.07 on remand, despite Jones' failure to raise

such an argument at the hearing. The ALJ should review the evidence and determine whether Jones' symptoms meet the requirements for Listing 12.07.

Fourth, Jones has argued that the ALJ discredited Dr. Mayle's opinion improperly. Generally, an ALJ affords more weight to the opinion of an examining source than the opinion of a non-examining source, but the ultimate weight given depends on the opinion's consistency with the objective medical evidence, the quality of the explanation, and the source's specialty. *Givens v. Colvin*, 551 F. App'x 855, 860 (7th Cir. 2013); **20 C.F.R. § 404.1527(c)**. "An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). An ALJ may give less weight to an examining source's opinion when it appears to rely heavily on the claimant's subjective complaints. *Givens*, 551 F. App'x at 861; *see* **20 C.F.R. § 404.1527(c)(3)** ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give the opinion. The better explanation a source provides for an opinion the more weight we will give that opinion."); *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012).

The ALJ discredited Dr. Mayle's opinion because she failed to offer an opinion on Jones' ability to function in a work setting and she relied on his subjective allegations uncritically, which the ALJ found incredible. However, the ALJ gave Dr. Mayle's opinion some weight because her findings were consistent with the RFC's mental limitations. Jones has argued that the ALJ erred because there was no support that Dr. Mayle relied on his subjective allegations uncritically. Furthermore, he noted that the ALJ failed to identify how Dr. Mayle's report was inconsistent with the credible evidence.

The Commissioner noted that Dr. Mayle referenced only Jones' statements and reports when finding that he could not meet his daily needs.  Additionally, she argued that Jones' allegations were inconsistent with the credible evidence.  For example, the Commissioner compared Jones' statements that his daily living activities were extremely limited and that he could barely leave his home to his reports that he attended college classes continuously for two years before Dr. Mayle's examination.  The ALJ may discredit Dr. Mayle's opinion because it relied heavily on Jones' subjective complaints.  *Givens*, 551 F. App'x at 861.  Additionally, she may discredit Dr. Mayle's opinion because it did not include a quality explanation and was inconsistent with the objective medical evidence.  *Givens*, 551 F. App'x at 860.  Therefore, the ALJ did not err by discrediting Dr. Mayle's opinion.  However, she may further explain why she found the opinion inconsistent with the credible evidence in the record on remand.

Based on the foregoing reasons, the decision of the Commissioner is **REMANDED**.

ENTERED this 26th day of August, 2015.

/s/ Andrew P. Rodovich
United States Magistrate Judge